Associate Chief Justice LEE,
concurring in part and concurring in the judgment;:
[ 40 I concur in the judgment of the court and in elements of the majority's analysis. Thus, I share the majority's goal of "giving] effect to the intent of the Legislature," and of looking for such intent in "the text of the statute." Supra 110. And I agree that our interpretation of the operative statutory text "turns on the meaning of the term 'discharge' in the context of a "dangerous weapon or firearm."'" Supro T11. Ultimately, moreover, I concur in the court's construction of this statutory phrase-as defining the element of prosecution in terms of "each discrete shot" expelled from a gun. Supra T 1.
141 I write separately, however, because I cannot resolve the ambiguity in the term discharge as the court does—by mere resort to the dictionary. I see the need to look elsewhere. I would interpret the terms of the statute by looking for real-world examples of its key words in actual written lan- ° guage in its native context. This sort of analysis has a fancy name-corpus linguisties. But it is hardly unusual,. We often resolve problems of ambiguity by thinking of | examples of the use of a given word or phrase in a particular linguistic context, I propose to do that (as I have in a couple of prior opinions) on a systematic seale-by computer-aided searches of online databases in an effort to assemble a greater number of examples than I can summon by memory on my own.
{42 I begin with a description of the question presented in this case as I understand it. Then I outline my approach to answering it. And I close with a response to criticisms to my methodology.
I
148 My starting point is in line with the majority's: I would seek to discern the intent of the legislature, and to find it in the language it enacted into law. When the text is plain that enterprise is straightforward. But in cases litigated to an appeal that is rarely the case. The statutory text in such cases is often ambiguous. One form of ambiguity concerns a conflict between the "ordinary" and "specialized" meaning of a term. Thus, a threshold question is whether the legislative text conveys some specialized meaning-as in the case of a statutorily defined term, a scientific phrase, or a legal term of art[1] If so that is the end of the matter; the special *1272 ized meaning controls if it was intended by the legislature.[2]
44 Another form of ambiguity concerns a contest between two different definitions of a word in common usage. But "[the fact that the statutory language may be susceptible of multiple meanings" does not leave us without an answer, as all but one of the meanings is often "eliminated" by the structure or context of the statute. Olsen v. Hagle Mountain City, 2011 UT 10, ¶ 13, 248 P.3d 465. When neither of two competing meanings can be so eliminated, however, we opt for the meaning we deem as more "ordinary." See Hi-Country Prop. Rights Group v. Emmer, 2013 UT 38, ¶¶ 18-19, 21-22, 304 P.3d 851.
"[ 45 This case presents this latter question. No one has suggested that discharge is a specialized term,[3] or that the structure of the statute eliminates one of the parties' pro-
posed definitions. So we are left to construe the relevant statutory language to convey the "ordinary meaning" of its terms-the meaning its words would have in the mind of a "reasonable person familiar with the usage and context of the language in question." Olsen, 2011 UT 10, ¶ 9, 248 P.3d 465.[4]
{46 Dictionaries are a good "starting point" for analyzing ordinary meaning. Hi-County Prop. Rights Grp. v. Emmer, 2018 UT 33, 119, 804 P.8d 851. They are "useful in cataloging a range of possible meanings that a statutory term may bear." Id. (citing Henry M. Hart, Jr. & Ausert M. Sacks, THs Lrcar ProcEss: Basic ProsuEms In THE Maxima anp AppuicatION or Law 1875-76 (William N. Eskridge, Jr. & Phillip P. Frick ey eds., 1994) [hereinafter Hart & Sacks]). Dictionaries provide "'an historical record, not necessarily all-inclusive, of the meanings which words in fact have borne." Id. (quot *1273 ing Hart & Sacks, at 1190). "Such a record, however, will often fail to dictate 'what meaning a word must bear in a particular context'" Id. (quoting Hart & Sacks, at 1190). "That question will often require further refinement-of selecting the best meaning among a range of options, based on other indicators of meaning. . .." Id.
147 This case requires such "further refinement." It is "one of those cases where the dictionary fails to dictate the meaning that the statutory terms 'must bear' in this context." State v. Canton, 2013 UT 44, ¶ 14, 308 P.3d 517. That is because, as in Canton, "dictionary definitions" of the operative terms of the statute "leave the statute semantically open to" both parties' positions. Id. On one hand, as the majority indicates, discharge is susceptible to the definition advanced here by the State-of discharge as "to release from confinement" or "to shoot." Supra 112 (quoting Marrtam-WBBsrar's Dictionary 356 (11th ed.2012)).[5] Yet that is not the only sense of discharge identified in the dictionary, Discharge is also understood as "to empty of a cargo: UNLOAD." See WaeBstEr's tHirp Int'l Dict. 644 (8d ed.2002). And that is the sense of discharge advanced here by the defense. Rasabout urges a unit of prosecution defined by unloading or emptying the contents of a weapon, asserting that the latter sense of discharge supports his position.
148 The majority paints part of the relevant picture. It cites the first of the above definitions and adopts it as the operative sense of discharge of a firearm under Utah Code section 76-10-508(1)(a). But the majority fails to acknowledge the second dictionary definition set forth above. And I am unsure of its basis for preferring the first definition over the second.
€49 In context, I see three possible grounds for the court's conclusion. But each falls short.
150 First, the definition invoked by the court may be listed first in the dictionary, see Mrrriam-WaeBstEr's ConnReraATE® DICTIONARY at 856 (listing, as the first sense of the verb discharge, "to relieve of a charge, load, or burden"), but there is no such thing as a "main" or "primary" dictionary definition.[6] "The dictionaries most relied upon by courts in statutory interpretation make no claims about the ordinariness of the words they define or the senses they assign to those words." J.M.W. v. T.L.Z. (In re Baby E.Z.), 2011 UT 38, ¶ 98, 266 P.3d 702 (Lee, J., concurring) (citing Stephen C. Mouritsen, The Dictionary Is Not a Fortress: Definitional Fallacies and the Corpus-Based Approach to Plain Meaning, 2010 BYU L. Rev. 1915, 1925-45 (discussing problems with dictionary usage by courts)). "Nor do they present their lexical information in a way that reveals 'ordinary' usage." Id. "A number of dictionaries simply rank their definitions according to evidence of historical usage." Id. (Emphasis added). The dictionary cited by the majority, Webster's, "expressly disavows any attempt to establish a hierarchy of ordinariness in the ranking of its senses, admitting that sometimes an 'arbitrary' listing of senses is used." Id.; see also MErRriam-WaesstEr's COLLEGIATE DICTIONARY at 2023. So the dictionary generally cannot provide the basis for preferring one of its definitions over another.
*1274 51 Second, the majority seems to attribute significance to the apparent meaning of the component parts of the term discharge. In embracing the shoot sense of discharge, the court notes that the term "is made up of ... a prefix ['dis'] and the root word ['charge']." Supra 112. And because "dis" conveys a "negative or opposite," and "charge" indicates a "quantity of explosive," the majority concludes that "the clearest reading of the statute is that discharging a weapon or firearm means shooting a weapon or firearm." Supro 112. The ordinary meaning of a word is not always discernible by simple addition, however. Many words take on meanings that bear a strained relation to the sum of their constituent parts-including words with the prefix "dis," like disease or disheveled. The former is more than a mere state of unease.[7] And the latter is not the opposite of sheveled.
52 In this case, discharge does appear to convey the undoing of a charge. But that conclusion still begs the question of the nature of the charge being undone. Even if the relevant charge is, as the majority says, a "quantity of explosives," we must decide here what quantity of explosives must be undone to count as a discharge. The majority says that it's a "single projectile with a single explosion." Supra 113. That sounds fine. But Rasabout's alternative is no less defensible; all of the bullets in a gun's magazine also qualify as a "quantity of explosives." So the majority's deconstruction of the component parts of discharge does not yield a conclusive answer to the interpretive question presented. :
[ 53 That leaves a third explanation for the majority's conclusion: The court's sense of discharge as shoot may simply be an expression of the majority's linguistic intuition. That is the way most problems of lexical ambiguity are resolved by our courts.[8] Instead of acknowledging and rejecting contrary senses of a statutory term, judges tend to ignore them-identifying only the sense of a word they deem ordinary without acknowledging any others.
« 54 Reliance on judicial intuition is entirely appropriate. When confronted with problems of ambiguity in legal text, judges must employ their intuition to discern the proper sense of its terms. Too often, however, we proffer our intuition as if it were authoritative; and when we do so in a manner cloaking alternative senses of the operative terms, we deprive the parties and the public of a clear understanding of the complex nature of the linguistic problems that we confront. We also risk confirmation bias, or just old-fashioned mistake. The former risk is well- *1275 known.[9] And it is magnified in eases where our analytical methods are opaque. Our human intuition of ordinary meaning, moreover, is. fallible. As linguists have noted, our analysis of word meaning and usage “remains hidden from introspection,”- and may thus too often be mistaken.[10]
¶ 55 For these reasons we should be more transparent about our means of resolving the difficult problems of interpretation that come before us. When confronted with a contest between two competing constructions that each find tenable support in our lexicon, we should openly acknowledge the ambiguity. And when we resolve that ambiguity based purely on instinct or intuition, we should be open about that.
¶ 56 I would do so here. Instead of embracing one accepted sense of discharge of a firearm and ignoring the contrary understanding, I would acknowledge both. To’the extent my intuition tells me (as it does) that the single shot sense of discharge is the more ordinary sense of discharging a firearm, moreover, I would openly present that as the basis for our decision. I would also take the matter a step further, however. I would also cheek my intuition against publicly available means for assessing the ordinary meaning of a statutory phrase. My proposed means for doing so are outlined below.

[11]

¶ 57 In this age of information, we have ready access to means for testing our resolution of linguistic ambiguity. Instead of just relying on the limited capacities of the dictionary or our memory, we can access large bodies of real-world language to see how particular words or phrases are actually used in written or spoken English. Linguists have a name for this kind of analysis; it is known as corpus linguistics.
¶ 58 The> fancy Latin name makes this enterprise seem esoteric and daunting. It is not. We all engage in it even if we don’t attach the technical label to it. A corpus is a body, and corpus linguistics analysis is no more than a study of language employing a body of language.[11] When we communicate *1276 using words we naturally access a large corpus-the body of language we have been exposed to during our lifetimes-to decode the groups of letters or sounds we encounter. The most basic corpus linguistics analysis involves our split-second effort to access the body of language in our heads in our ongoing attempt to decode words or phrases we may be uncertain of, We all do that repeatedly every day.
1 59 The first time we heard a skateboarder described as "so sick," we may have mis-perceived that description as negative-if not an indication of illness, then at least a general notion of repellence. Oxrorp ENGLISH Dictionary online, "sick" (definitions 1a and 4a(d)). In time we learned to decode the above use of this term in this context. We came to understand that "so sick" in this context was not criticism but high praise. Oxrorp Dictionary online, "sick" ("slamg (now esp. Skateboarding and Surfing). Excellent, impressive; risky"). Our means of sensing that meaning, moreover, was not a matter of looking the word up in the dictionary (as the word sick itself can mean all of the above, and this new meaning does not yet appear in most dictionaries). It was a matter of accessing the body of language we have encountered to view the meaning of the word in its broader context-the object of the adjective (skateboarder), the broader phrase ("so sick"), and even the demographics of the speaker (millennial).
T60 Judges have long employed similar methods of decoding the language of the law. To resolve ambiguities in statutes, judges access their memory of the use of uncertain terms in the context in which they have heard them used.[12] In so doing they are engaged in corpus linguistics analysis. And no one bats an eye, because this is a natural, accepted method for humans to resolve ambiguities in language. 61 It is a small step to utilize a tool to aid our linguistic memory. Judges do this with some frequency as well. Naturally. If judges are entitled to consult the corpus of language in our heads (and how could we not?), we must also be permitted to supplement and check our memory against publicly available sources of language.
61 It is a small step to utilize a tool to aid our linguistic memory. Judges do this with some frequency as well. Naturally. If judges are entitled to consult the corpus of language in our heads (and how could we not?), we must also be permitted to supplement and check our memory against publicly available sources of language.
162 A dictionary, in fact, is a corpus. Its material-definitions of an extensive body of words-is compiled from broader linguistic corpora.[13] And some dictionaries include
1 63 Judges have also looked to databases available in Westlaw or Lexis, or more broadly through an internet search engine, to help us recall how particular words or phrases are commonly used in written or spoken English, We have done so in opinions for *1277 this court.[14] Court has also taken this approach.[15] And judges have long analyzed the meaning of legal words and phrases by seeing how other courts have used them."[16] That too is corpus analysis. The United States Supreme
T64 I would employ this sort of tool in resolving this case. In part ILA. below, I present the results of a Google News search. The results of that search demonstrate that the verb discharge as used in conjunction with a firearm is almost always used in the sense of a single shot (and not the emptying of all of the bullets available in the magazine).
T 65 I would also take this analysis a step further, however. For reasons described below, there are reasons to look beyond Google News to consult an additional tool for understanding the notion of discharge of a weapon as that phrase is commonly used in written or spoken English,. In part ILB., I present a parallel analysis employing an online tool for analyzing a large online collection of written and spoken Einglish-the Corpus of Contemporary American English (COCA), available at corpus.byu.eduw/coca. The search results from this analysis confirm this same understanding of discharge of a weapon, but with greater transparency and reliability.
A
66 A natural place to go for access to a large body of linguistic data is the internet. Most all of us (even judges) are familiar with this source of data, and with the search tools for accessing it. And thoughtful analysis using the results of a common search engine can generate data we may use as an empirical check on our (imperfect) linguistic intuition.[17] 167 Judges on this court and elsewhere have begun to access this resource as we tackle problems of lexical ambiguity. Over the past few years, members of this court have authored several separate opinions presenting internet search results in support of our construction of ambiguous statutory text." More recently, in State v. Canton, 2018 UT 44, 308 P.8d 517, we employed such an approach in an opinion of the court. Our unanimous Canton opinion resolved an ambiguity in a tolling provision for our eriminal statutes of limitations, Utah Code section 76-
167 Judges on this court and elsewhere have begun to access this resource as we tackle problems of lexical ambiguity. Over the past few years, members of this court have authored several separate opinions presenting internet search results in support of our construction of ambiguous statutory text.[18] More recently, in State v. Canton, 2013 UT 44, 308 P.3d 517, we employed such an approach in an opinion of the court. Our unanimous Canton opinion resolved an ambiguity in a tolling provision for our eriminal statutes of limitations, Utah Code section 76- *1278 1-804(1). The critical statutory phrase tolls the statute of limitations during any period in which the defendant is "out of the state." And we resolved a critical ambiguity in that phrase-as to whether it referred to physical absence beyond a state's boundaries, or mere unavailability for legal process-by use of a Google News search.
T 68 In Canton we concluded that "[dlietio-naries [welre ... insufficient by themselves to resolve the interpretive task before us." Id. 120. And we therefore indicated a need to "look elsewhere to determine the ordinary meaning of the language of the tolling statute." Id. The "elsewhere" was a Google News search, which we employed to assess the "way the full phrase [out of the state'] is typically used in common parlance." Id. €26. The results of that search confirmed that "[when the phrase 'out of the state' is used in its full context, it refers to the physical territory of a state, not its political power or influence." Id. 1 27.
169 We described the search and its results as follows:
This conclusion is based on results of a (Google News search, http://news.google. com, considering 150 instances in which the phrase "out of the state" was used in news stories published in May 2018-27 of which involved references to the relationship between a person and the state. Not one of those 27 relevant references use "out of the state" in a manner involving absence of a person from the legal authority or influence of a state. Every single one of them makes unequivocal reference to the physical confines of a state.
Id. 127 n. 6. On the basis of these search results, we concluded that "although Canton's construction" of the Utah tolling provision was "semantically plausible based on dictionary definitions of 'out of and 'the state,' it cannot be reconciled with the uniform understanding of the extended statutory phrase 'out of the state'" Id. 127. Because "[that phrase is not used in the way that Canton construes it," we rejected it as incompatible with the ordinary meaning of the statutory text. Id.
T70 I would follow the Canton model in this case. Because both sides are able to marshal dictionary definitions in support of their view of discharge, we must reach beyond the dictionary to resolve this case. And, as in Canton, a Google News search confirms the conclusion that the majority adopts but cannot justify on the basis of the * dictionary, or etymology, or mere intuition.
T71 Google is a widely used, well-known search engine. As most people know, this search engine can do more than search the world-wide web. It may also be employed to search an extensive body of published newspaper articles.
172 Such a corpus is a reliable resource for assessing the ordinary meaning of a statutory term. Published newspaper articles are a useful body of natural language due to their size.[19] 'The Google News corpus, moreover, is both well-understood by the public (including judges and lawyers) and easily adapted for analysis (in that a search may be time-delimited and the search results may be reviewed in a systematic, transparent way). Unlike a dictionary, moreover, a Google search allows for analysis of phrases-or key words in a particular context-and not just individual words.
173 A Google News. search confirms the single shot sense of discharge when that term is used in connection with a firearm. On a search conducted on June 4, 2015, the phrase "discharge a firearm" generated forty-three hits for newspaper articles published between March 1 and June 4, 2015. Fifteen of those hits were inconclusive in terms of the intended sense of "discharge." I omitted those hits from my analysis. Of the remaining twenty-eight articles, none of them clearly support Rasabout's notion of discharge involving emptying all bullets in a gun's magazine.[20] And twenty-seven clearly employ the single shot sense of the term.
*1279 [ 74 The twenty-seven relevant hits linked to articles cited below.[21] Each of them- conclusively indicates that whem we speak of discharging a firearm, we are talking about a single shot, and not a complete emptying of a gun's magazine. In nine of the articles it is clear from the context that only one shot was fired. In two, each discharge is described as a separate event. In ten others, the term discharge is used in close connection with the terms shoot, fire or similar words describing a single firing of a gun. And in the remaining six, the use of discharge simply doesn't make sense grammatically if read as a reference to multiple shots.
T 75 I would employ the above corpus analysis to sustain the conclusion that each single shot is a separate discharge of a weapon under Utah Code section 76-10-508(1)(a). That is the conclusion suggested by my linguistic intuition. But, more transparently, it is also confirmed by an analysis of the use of natural language in current newspaper articles.
B
T76 Most any analysis of public sources of real-world language, in my view, is better than a judge's take-my-word-for-it assertion *1280 of ordinariness. But not all searches are created equal. A Google News search bears some of the key hallmarks of reliable analysis. It is certainly more transparent and easier to replicate than a judge's intuition.
T77 Yet a Google News search is hardly unimpeachable.[22] The Google algorithm is proprietary and thus not fully transparent. So we cannot tell exactly what factors affect the results of any given search on Google News.[23] Another concern goes to the replica-bility of a given search. My search terms and results are memorialized in the above footnotes. But because the Google algorithm is hidden, and the results of any given search may be affected by factors unknown to (or particularized for) an individual user, there is no guarantee that the same search performed at another time on another computer will generate identical results.[24]
T 78 These problems will be heightened- and others added to them-in a broader Google search of the world-wide web (as opposed to the Google News database). A search for relative hit counts is especially problematic. Consider the Seventh Circuit's analysis in United States v. Costello, 666 F.3d 1040, 1044 (7th Cir.2012). In Costello the court was faced with the question of the scope of the crime of "habor[ing}" an illegal alien under 8 U.S.C. § 182M4(@)(1)(A)Gii) (2012). Judge Posner, writing for the court, conducted a Google search to try to resolve an ambiguity-of whether the statute used Rarbor in the sense of "to give shelter or refuge to" (see THirp New INTERNATIONAL Dic. TIONARY, sense la(1)) or "to receive clandestinely and conceal" (id., sense la@Q)). To Judge Posner's credit, the Costello opinion acknowledged the limits of dictionaries. It noted that "[dlictionary definitions are ... acontextual, whereas the meaning of sentences depends critically on context, including all sorts of background understandings." 666 F.3d at 1042. And the court's instinets were generally in line with the tools and methods that I propose. Instead of purporting to resolve the lexical ambiguity by resort to a dictionary, Judge Posner sought to do so by means of a corpus analysis of the worldwide-web-via a Google search.
179 Yet Judge Posner's search highlights some deficiencies in standard Google internet searches. His search, as described in the Costello opinion, was as follows:
A Google Search ... of several terms in which the word "harboring" appears-a search based on the supposition that the number of hits per term is a rough index of the frequency of its use-reveals the following:
"harboring fugitives": 50,800 hits
"harboring enemies": 4,780 hits
"harboring refugees": 4,820 hits
"harboring victims": 114 hits
"harboring flood victims": 0 hits
"harboring victims of disasters": 0 hits
"harboring victims of persecution": 0 hits
"harboring guests": 184 hits
"harboring friends": 256 hits (but some involve harboring Quakers-"Friends," viewed in colonial New England as dangerous heretics)
"harboring Quakers": 8,870 hits
"harboring Jews": 19,100 hits [25]
1 80 From these results, the Costello opinion concludes that "(ilt is apparent ... that 'harboring,' as the word is actually used, has a connotation-which 'sheltering," and a forti-ori 'giving a person a place to stay'-does not, of deliberately safeguarding members of a specified group from the authorities, whether through concealment, movement to *1281 a safe location, or physical protection."[26] And on that basis the court reversed the conviction under review, concluding that there was no evidence to support the conclusion that Costello had "harbored" her boyfriend, an illegal alien, in the sense of seeking to conceal him from the authorities.
81 The Costello opinion is a step in the right direction. But it also highlights some deficiencies of Google web searches as a basis for assessing ordinary meaning,. The Costello analysis is vulnerable for reasons noted above-that hit counts are unreliable because the Google algorithm is unknown, as underscored by the fact that different searches at different times on different computers may reveal very different results."[27]
82 But the Costello approach is also vulnerable to other attacks. One is that Judge Posner's choice of search terms seems arbitrary. To assess the ordinary meaning of harbor, he searches only the present participle form of the verb (Rarboring). And he chooses objects of the verb (fugitives, enemies, refugees, flood victims, victims of disasters, victims of persecution, guests, friends, Quakers, and Jews) on grounds that are not stated. (Curiously, the statutory object-alien-is not included.)
183 These search terms are understandable. But they are somewhat arbitrary (presumably based on Posner's linguistic intuition), and could easily skew the results. The use of intuition is, again, understandable. But if the goal of this type of analysis is to check the judge's intuition, this move undermines a key benefit of the approach.
84 These problems can be addressed by means of a more transparent, reliable search tool. The tool that I would employ is one developed by a renowned corpus linguist, Professor Mark Davies This corpus is known as the Corpus of Contemporary American Usage (COCA). See Mark Davies, The Corpus of Contemporary American English 410+ million words, 1990-present, http://corpus.byu.edw/coca (2008). COCA is "the largest freely-available corpus of English, and the only large and balanced corpus of American English.... The corpus contains more than 410 million words of text and is equally divided among spoken, fiction, popular magazines, newspapers, and academic texts." Id.
185 Like Google or Westlaw, the COCA search engine is easy to use. But unlike Google, and to a lesser extent Westlaw, COCA is also completely transparent, and it generates search results that are easily replicable. COCA, moreover, avoids the shortcomings of a Google web search as noted above, and illustrated in the Costello opinion. With the COCA search engine, there is no need for a user to think up her own objects of the verb harbor. COCA allows the user to generate a list of the most common words used near harbor. Significantly, moreover, the user can search only for the verb forms of harbor.[28] So the COCA user can generate the most common nouns near harbor as a verb, instead of guessing at what they might be. That list of collocates (essentially, "word neighbors") in itself will give some insight into the ordinary meaning of karbor.
1 86 COCA also allows the user to do more than get a simple "hit count" A COCA search yields a display of each use of karbor, exactly like Google or Westlaw, in the context of each of its most common word neighbors. By examining each instance of harbor with its common word neighbors, we can assess the frequency of each of the attested meanings of the verb.
T87 COCA also facilitates transparency and replicability. A search performed on the COCA site can be saved and linked for future reference, allowing a party, counsel, or interested commentator to review the search results and assess the court's analysis.
188 I would accordingly utilize a COCA search to analyze the meaning of discharge of a firearm. My search[29] identified eighty *1282 six instances [30] of the verb discharge within five words of the nouns firearm, firearms, gun, and weapon. By examining the instances of discharge in connection with these nearby nouns, I confirmed that the single shot sense of this verb is overwhelmingly the ordinary sense of the term in this context.
189 Twelve of the eighty-one hits in the COCA search clearly linked discharge to a single bullet. In sixteen other hits, the discharge was accidental. I deemed those hits also consistent with the single shot sense of discharge, as it seems highly unlikely if not impossible that an accidental trigger-pull could result in a release of all of the bullets in a gun's magazine. Fifteen other hits were a bit more ambiguous; but on closer examination, the discharge in question seemed to imply a single shot (based on the nature of the weapon, the circumstance of the discharge, or description of the resulting damage).
1 90 In thirty-six other instances I conelud-ed that there was insufficient detail to indicate whether the discharge at issue had reference to a single shot or to the emptying of a magazine. One additional hit was rejected as irrelevant (involving a patient being discharged from a hospital, which happened to occur within five words of the word gun).
T91 In all, I found only one instance of discharge of a weapon that seemed consistent with the firing of multiple shots. Based on the context of this usage, it seemed likely that the discharge in question referred to a stream or burst of bullets instead of a single shot.
192 This COCA search accordingly confirms our linguistic intuition and is consistent with the Google News analysis above. It indicates that discharge of a weapon is used overwhelmingly in the single shot sense.: Of eighty-one hits, (forty-four that were conclusive and relevant) only one seems consistent with Rasabout's notion of a burst of bullets (and even then, there is no basis for concluding that the burst involved emptying the entire contents of a gun's magazine). Thus, almost every conclusive instance of discharge of a weapon involves a smgle shot.
93 This prov1des strong confirmation of the basis of our holding in this case. And it does so on the basis of a transparent database that is publicly available, created by linguists, and subject to replication by anyone seeking to confirm (or reject) my analy-sig.
III
T 94 Novel tools for tackling old problems naturally prompt skepticism. That reaction is all the more predictable when the new tool | implicates unfamiliar technology.
T95 For decades lawyers used paper digests and other hard-copy compilations to find judicial opinions to support their arguments. When computer-searchable databases of opinions were first introduced, some were dubious. For years some even predicted that computer-based research would undermine the lawyer's craft.[31] Not many of us think that way now. The addition of the tool of computer-based research is widely viewed as an enhancement, particularly when used in combination with other, tradltlonal . methods.
96 The point is not that corpus linguistic analysis is the next Westlaw or Lexis. Its utility is obviously more narrow. But the analogy is apt in that the tool I'm proposing would not replace but add to existing methods, and it would do so in a manner that takes advantage of technology available to us in the computer age.
I 97 That said, I accept many of the points raised by Chief Justice Durrant in his con *1283 currence, I too see a need to proceed with caution, supra 1 39, and to "weigh the potential usefulness" of corpus analysis "against its potential cost." Supra 138. And I certainly agree that this analysis "would be best employed by us, or by other judges, ... after the parties bave raised it and argued it." Supra T 37. That is true for anything we do. We depend on the adversary process. Our opinions are better when adversary briefing is complete and in-depth.
[98 Yet I do not see these as barriers for employing corpus analysis in this case. The parties have squarely presented the issue of the meaning of discharge of a weapon for our resolution, and they have given their best shot at offering linguistic analysis (using dictionaries and the lawyers' own linguistic intuition) on that issue. To some extent all members of the court have gone beyond the parties' briefing in deciding that issue. It is no affront to the adversary system for us to do that, as it is not just inevitable but entirely appropriate. (No one thinks that a careful judge should suspend independent analysis.) And it adds mostly transparency to extend our discussion to encompass the corpus analysis set forth in my opinion."[32]
99 I concede that the Google News and COCA tools that I have employed will be unfamiliar to many. But it is not the case that my "rationale" is "different in kind from any argument made by the parties," or even from analysis presented by my colleagues. Supra 117. Every member of this court is addressing the same issue,[33] and we all are engaged in the same basic analysis-of seeking the ordinary sense of discharge when that term is used in connection with a firearm. We can do that using our intuition and the corpus-based information compiled in a dictionary (as my colleagues do), or we can extend the analysis (as I have) to look at examples of real-world language compiled by a Google News or COCA search,. Neither approach is "subject to scientific review." Supro T 16. And neither yields to Mr. Rasa-bout "a reasonable opportunity to present a different perspective," supra T 17, if by that we mean the chance to engage with us at the opinion-writing stage to respond to our arguments.
[ 100 Parties never have that opportunity, however. And they have no more opportunity to do that with regard to the majority's approach than with miné. The majority's insistence that discharge means shoot in this context is based on the majority judges' linguistic intuition-informed, no doubt, by the body of language that they have encountered during their lifetime. Certainly that analysis is not "subject to scientific review," much less to pushback from Mr. Rasabout.[34]
T101 The majority's remaining concerns are a bit more substantial, or at least desery-ing of a more fulsome response. In the paragraphs below, I respond to the court's charges (a) that corpus analysis is a "scientific field of study" that is the domain of an expert witness and not a generalist judge, swpre (b) that judges lack the expertise necessary to conduct reliable corpus analysis, supre 1419-21; (c) that the introduction of corpus analysis will "place an unbearable burden" on the judicial system by requiring "dueling linguistics experts" "in every case," supra 119; (d) that my approach ignores corpus analysis of "the text of the Utah Code," supra 121, and suggests that "ordinary meaning is the exclusive tool available to us in our effort to effectuate legislative intent," supro 110 n. 16; and (e) that *1284 my corpus analysis is problematic in that it discards a certain number of hits "as having "insufficient detail'" to be conclusive, supra € 21.
A
1 102 The legal or ethical propriety of "sua sponte" corpus analysis by a judge is a valid question. See supra 117. On a range of scientific matters, we think of research or analysis as the domain of experts. And we rightly eschew a judge's independent attempts at his own scientific "findings." Su-pro 120. Such analysis, in fact, would be a breach of judicial ethics.
103 In Utah, our Code of Judicial Conduct provides that "[a] judge shall not investigate facts in a matter independently, and shall consider only the evidence presented and any facts that may properly be judicially noticed." Urax R.J. Aomm.Cop® Canon 2, Rule 2.9(C). So the majority would be right to reject my corpus analysis if it were a matter of independent factual investigation. That is usually what is involved in the "scientific field[s] of study" cited by the court. Supro 1 18. And on such questions, it would undoubtedly be improper for us to "conduct scientific research" or to "contrive of interesting research projects that require expertise in fields in which we have no training." Supro I 18.
{104 But that is not at all what I am engaged in. Independent investigation is foreclosed only as to "facts," not law. That is significant. Judicial analysis of the meaning of language, using corpus analysis or anything else, is aimed at interpreting the law. That is the judge's role. In performing the core function of deciding what the law is or should be, we cannot properly be restricted from consulting sources that inform our understandings[35]
T 105 The operative rule makes that abundantly clear. It opens the door to the consideration of "facts that may properly be judicially noticed." Urax R.J. Aomin.CopE Canon 2, Rule 2.9(C). To the extent the analysis presented above encompasses "facts" (e.g., as to the way the verb discharge is typically used in our language in connection with the noun firearm or its synonyms), moreover, our law makes clear that we are free to consider them as a matter of judicial notice. Otherwise my colleagues' opinions also cross the line, as they also consider evidence not presented in the briefs regarding the ordinary meaning of discharge A judge's judicial notice power is addressed by rule 201 of our rules of evidence. That rule indicates that the limitations in the rule are addressed to "an adjudicative fact only, not a legislative fact." Uraw R. Evin. 201(a). And the advisory committee note explains the distinction. It says that "[slince legislative facts are matters that go to the policy of a rule of law as distinct from the true facts that are used in the adjudication of a controversy they are not appropriate for a rule of evidence and best left to the law-making considerations by appellate and trial courts." UTAX R. Evip. 201 advisory committee's note. Thus, this type of analysis is an appropriate method of judicial analysis because it goes to "the policy of a rule of law as distinct from the true facts that are used in the adjudication of a controversy." "[36] Id.
*1285 1 106 On reflection, moreover, this must be correct. A contrary conclusion would call into question a wide range of opinions of this court and many others. If we were foreclosed from considering outside material that informs our resolution of open questions of law, we would be barred from engaging in historical analysis relevant to a question of original meaning of a provision of the constitution, or from considering social science literature in resolving a difficult question under the common law. Linguistic analysis is no different; to the extent we charge our judges with resolving ambiguities in language, we cannot (and do not) reasonably restrict their ability to do so on a well-informed basis-even on grounds not presented by the parties, and not within the domain of judges' professional training. Such a restriction, after all, would not just foreclose corpus analysis; it would also prevent us from consulting a dictionary or our own experience with language.
B
1107 It is likewise fair to question our ability to perform corpus analysis properly. Most judges are generalists. And few if any have specialized training in corpus linguistics, So I concede the point that judges will not bring to bear the kind of training possessed by "linguistics experts" retained by the parties. Supra 1 19.
1108 But that, respectfully, is not the point. We judges are experts on one thing-interpreting the law. And the fact that that enterprise may implicate disciplines or fields of study on which we lack expertise is no reason to raise the white flag. It is reason to summon all our faculties as best we can, and to overcome any weaknesses we may possess. 'This is not a matter of dreaming up "interesting research projects." Supra " 18. It is a matter of doing our job-of doing all we can to understand and implement the will of the legislature as expressed in the terms of its statutes, and to convey our grounds for doing so in a written opinion.
$109 That job isn't always easy. It involves not just linguistic analysis but also historical inquiry-e.g., in finding original meaning. Few of us have training in historical research. It may even be said that lawyers and judges "are for the most part extremely bad historians," and may "make up an imaginary history and use curiously unhistorical methods." [37] Yet judges of all stripes engage in historical analysis, particularly in their interpretation of the constitution. So the response to our lack of historical training is not to back away from the enterprise; it is to arm ourselves with the tools necessary to do the best history we can.
110 We face a parallel problem when it comes to our analysis of the meaning of language. When it comes to training or experience in methods of linguistic analysis, most of us lack specialized training. So there is certainly a risk, to paraphrase Max Radin, of judges using curiously unscientific linguistic methods.
1111 But the proper response to this risk is not the abandonment of the enterprise of linguistic analysis. That enterprise is an integral element of judging. Judges cannot do their job without assessing the ordinary meaning of words. So the question is not whether to engage in linguistic analysis; it is whether to do so with the aid of-instead of in open ignorance of or rebellion to-modern tools developed to facilitate that analysis.
1 112 We could continue to judge the ordinary meaning of words based on intuition, aided by the dictionary. But those tools are problematic, for reasons explained above. And the impact of a judge's mere gut intuition is entirely opaque. So it is our current methodology and tools that involve bad lin-guistiecs produced by unscientific methods. If the concern is reliability, the proper response is to embrace-and not abandon-corpus-based analysis.
*1286 {113 To do so well, we judges must seek to understand this field better. We are not experts. At least I am not; I do not possess a complete understanding of the methodologies at our disposal. But I am convinced that the approach employed above is essential to a more reliable, transparent fulﬁllment of this judicial task.
114 Corpus analysis, in all events, is not rocket science. At some level we all do it intuitively in our minds. It's a small leap to check our intuition against examples of real-world language revealed by a Google- or COCA-based [38] search of a body of written English, We don't need much expertise to do that well.[39]
115 Corpus analysis is like math-at one level it's something basic that everyone does; at another level it's something complicated that only "experts" can do. The type of corpus analysis I am doing-and advocating-is the former, I just think we should be using a calculator instead of doing it in our heads.
116 As to historical analysis, Justice An-tonin Scalia and his co-author. Bryan Garner have aptly repudiated the charge that "'n one can reconstruct original understandmg precisely'" with a powerful reminder of the judicial task: "Our charge is to try." [40] The same can be said of linguistic analysis, It may not be possible to resolve questions of ordinary meaning with absolute certainty. But we must try. And in so doing we must bring to bear the methods and tools developed in the 21st Century to better understand the meaning of language'for this eru-cial element of judging.
C
"117 I see no reason to expect that the introduction of corpus analysis in judging ordinary meaning will require "dueling linguistics experts" "in every ... case" where both sides present plausible dlctlonary definitions to support their position. Supra 119. First, as noted, this isn't rocket science. Just as lawyers in constitutional litigation have learned to present historical analysis of original meaning, counsel in statutory cases can compile Google-or COCA-based examples of the use of statutory phrases in real-world written English To do this well, lawyers will have to inform themselves a bit in basic linguistic methodology. But lawyers are crafty and ingenious. They learn new methods and tools all the time. I see no barrier to their presentation of helpful analysis in this field.
{118 Perhaps there will be an occasional case where linguistics expertise could be useful, and where a party may wish to retain an expert. But even if an expert were retained in every case in which corpus analysis were determinative, we would hardly see experts in "every ... case" in which the parties proffer dueling dictionary definitions. Again the majority misunderstands my approach, Corpus analysis is something of a last resort. It comes into play only if we find that the legislature is not using words in some spe-clalized sense, and only if we cannot reject one of the parties' definitions based on the structure or context of the statute. See su-pro 14 48-44. Corpus analysis comes in, in other words, as something of a tie-breaker where we find no better way of resolving the *1287 matter. In my five years on this court, I have employed such analysis only a very few times.[41] In the many other statutory cases that come before us, I have disposed of the matter using more traditional tools of interpretation. >
{119 The "unbearable burden" imagined by the majority, supra "19, is a strawman. Lawyers can eagily learn to present corpus analysis in the vast run of cases that implicate this approach, and the need for experts will at most be very occasional.
D
{120 The majority's next criticisms of my corpus analysis-that it ignores consideration of "the text of the Utah Code," supra T 21, and suggests that "ordinary meaning is the exclusive tool available to us in our effort to effectuate legislative intent," supro 110 n. 16-are based on misconceptions. First, a corpus analysis of the "text of the Utah Code" would make sense if we were thinking of discharge of a firearm as a legal term of art. In that case I would agree wholeheartedly with the notion of searching for uses of the statutory language to "identify ... idiosyncrasies" in the way this term is used in the "rule of law in this state." Supra 21. But no one (certainly not the majority) has proffered the view that discharge is a legal term of art subject to specialized meaning in the law. Everyone agrees that this term is being used in its ordinary sense. So the critique for the lack of this kind of analysis is puzzling. so
{121 Second, I am not at all seeking to limit the enterprise of statutory interpretation to a search for "ordinary meaning" in all cases. None of my (unanimous) opinions string-cited dismissively by the majority "suggest that ordinary meaning is the exclusive tool available to us in our effort to effectuate legislative intent." Supro 110 n. 16 (citing, in reference to this criticism, Bar-neck v. Utah Dep't of Transp., 2015 UT 50, ¶ 28, 353 P.3d 140; State v. Bagnes, 2014 UT 4, ¶ 13, 322 P.3d 719; Hi-Country Prop. Rights Grp. v. Emmer, 2018 UT 33, ¶ 18, 304 P.3d 851; State v. Canton, 2013 UT 44, ¶¶ 12-13, 308 P.3d 517; Olsen v. Eagle Mountain City, 2011 UT 10, ¶ 9, 248 P.3d 465). All of these opinions are in line with the approach I have outlined here-of asking first about specialized meaning, looking next for structural or contextual grounds for eliminating one of the parties' definitions, and resorting to ordinary meaning only at the end of the interpretive road. None proposed a search for ordinary meaning as "the only consideration" in statutory interpretation. See also supra " 48 n. 1,
122 I have no quarrel, of course, with the goal of "giv[ing] effect to the intent of the Legislature." Supro 110. That is the aim of any thoughtful jurist on a matter of statutory interpretation. And it is the enterprise that we are all engaged in here.
1123 Sometimes we speak of a difference in the theory or methodology for getting there. There is a purported division-sometimes acknowledged in judicial opinions, and more often in law journals-between judges who approach matters of interpretation from the standpoint of "purposivism" and those who see their enterprise as a matter of "tex-tualism." [42] But these "labelfs] tend[ ] toward caricature";"[43] "textualism and purpo-sivism ... share more conceptual common ground than" is "sometimes emphasized." [44] "[NlJo 'textualist favors isolating statutory language from its surrounding context, and no critic of textualisgm believes that statutory text is unimportant." [45] So the overlap is significant. Both approaches look for legislative intent, both seek to find it in the statutory text, and both acknowledge the relevance of context in interpreting the text. ~
11 124 In my opinions on statutory interpretation, I tend to speak of our role in inter *1288 preting the text of the statute, as that is what was voted on and signed into law by the legislature and the governor.[46] This is a basic premise of textualism. But my approach to interpretation is founded on the notion of legislative supremacy and is aimed at finding legislative intent. And it acknowledges the need to consider context-and even a carefully informed sense of legislative purpose-in resolving ambiguities in statutory language. [47] To a large extent this is just a flipside of modern [48]
{125 I have long understood my colleagues on the court to share this essential view of our role. We may occasionally use different labels to describe our aims, but it has always seemed to me that we are engaged. in the same essential function.[49] Thus, I have not viewed our court's opinions as embracing "old-school" purposivism-of a prerogative of "adjust[ing] the enacted text to capture what [the legislature] would have intended" if it had thought about the issue before the court more carefully.[50] My colleagues' purposivism, as I understand it, is one that looks to statutory language to find legislative intent, and is bound by the meaning of those words as we interpret them.
126 I am comfortable that this is a close cousin to the textualist approach that I have taken. So I have joined opinions authored by my colleagues even though they do not *1289 speak in explicitly textualist terms. And my colleagues have joined my opinions even though they are framed in textualist terms [51] (and may even include corpus analysis[52] ).
127 My textualism has never been about finding "ordinary meaning" as the "exclusive tool available to us in our effort to effectuate legislative intent." Suproe 110 n. 16. The court's critique along those lines is simply mistaken. In this case I'm asking the exact same question the court is asking; I'm just resorting to an additional tool for answering it.
128 The tool I employ (COCA) and the methodology I use (corpus analysis), moreover, are not just for textualists, They are for anyone who is interested in analyzing text. All judges-textualists and purposiv-ists and others-focus on the meaning of statutory language. The question is how to do so-whether to stick with using our intuition and dictionaries only, or whether to check our intuition by searching a database of language. I see more upside than downside to taking that step.
E
€129 I welcome focused critiques of the corpus analyses I have presented as grounds for my decision. A main point of my approach, after all, is to facilitate transparency and discourse. But the majority's criticism of my exelusion of thirty-six "inconclusive" hits from my COCA analysis is puzzling, as is its challenge to the "statisiticall ] signifi-can[ee]" of my conclusions. Suproe T21. The decision to exelude thirty-six of the hits in the COCA analysis is straightforward. I didn't "ignore" them. Supra T21. I found "insufficient detail to indicate whether the discharge at issue had reference to a single shot or to the emptying of a magazine." Supra 1 90.
1 130 I am unsure of the majority's discomfort with that decision. If it thinks the thirty-six hits that I excluded cut against my conclusion, it should say so. The sentences I analyzed are available to the majority at the link I provided, so the majority could easily have examined those thirty-six hits I left out to determine whether I did so appropriately. Absent a specific critique, I will simply stand by the above analysis.
131 The same goes for the "interpretive assumption[s]" that led to my treatment of other hits. See supra T 21. The COCA data are preserved and available for review. Chief Justice Durrant apparently reviewed them and was satisfied with my conclusions. See supra TBT n. 10 (indicating that he "found no ... flaws" in his "own examination" of my COCA analysis). The majority is free to do the same. If it disagrees with my "interpretive assumption[s]" or my exclusion of inconclusive hits it should offer reasons for so concluding.
$182 I am unsure what the majority is looking for in terms of statistical significance. I found only one sole instance of discharge of a firearm that had arguable reference to multiple bullets. That was out of eighty-one hits, or forty-four hits after excluding those that were inconclusive or irrelevant. That is statistically significant under any measure.[53]
*1290 $133 In all events, the majority's criticisms again are a boomerang for its position. If the concern is for statistical significance, you can't get more insignificant than a data point of one-particularly if the data point is not unbiased. The problem with the majority's analysis, at its core, is that it is rooted in the subjective linguistic intuition of an individual judge (or a panel of them). The aspiration for statistical significance is a good one, but that goal is hardly advanced by the insistence on a judicial prerogative of resolving ambiguity based on pure intuition without resort to objective means for testing it.
IV
« 134 The resolution of ambiguities in legal language is one of the most important of all judicial tasks. It is also one of the most opaque; for that reason it is fraught with the potential for bias and error. We should do what we can to minimize those risks. The approach I have outlined is a step in that direction.

. See Barneck v. Utah Dep't of Transp., 2015 UT 50, ¶ 28, 353 P.3d 140 (unanimous opinion) (construing thé statute according to its ordinary meaning after determining that the statute does not expressly define the term at issue and the term was not a "technical term of art"); State v. *1272 Bagnes, 2014 UT 4, ¶ 13, 322 P.3d 719 (unanimous opinion) (noting that because the term at issue is not defined by statute, the Court "must accordingly look elsewhere to derive its meaning-to either the ordinary meaning of the word, or to its technical sense as a legal term of art") (footnote omiited); Hi-Country Prop. Rights Grp. v. Emmer, 2013 UT 33, ¶ 18, 304 P.3d 851 (unanimous opinion) (only seeking to determine the ordinary meaning of the term at issue after finding that the "term is not expressly defined in the Act, and does not appear to be a technical term of art") (footnote omitted); State v. Canton, 2013 UT 44, ¶¶ 1213, 308 P.3d 517 (unanimous opinion) (determining the ordinary meaning of the terms in question only after rejecting the proposition that it was a technical term of art); Olsen v. Eagle Mountain City, 2011 UT 10, ¶ 9, 248 P.3d 465 (unanimous opinion) (interpreting the statute according to its plain meaning because it uses nontechnical speech); Parkinson v. State Bank of Millard County, 84 Utah 278, 35 P.2d 814, 821 (1934) ("Ordinarily the Legislature speaks only in general terms.... Words and phrases are presumed to have been used according to their plain, natural, and common import and usage of the language, unless obviously used in a technical sense."); State v. Navaro, 83 Utah 6, 26 P.2d 955, 956 (1933) ("Under the ordinary canons of construction of statutes we are required to give the word its plain, natural, ordinary, and commonly understood meaning, in the absence of any statutory or well-established technical meaning, unless it is plain from the statute that a different meaning is intended."); State v. Hendrickson, 67 Utah 15, 245 P. 375, 378 (1926) ("[It is] the fundamental rule recognized in every jurisdiction of the country that words and phrases are construed according to the context and the approved usage of the language. Except in the case of technical words and phrases, they must I be construed according to their plain and ordinary meaning."); Miles v. Wells, 22 Utah 55, 61 P. 534, 536 (1900) ("[WJhere there is no ambiguity, the language must be taken as the expression of the legislature's intention, unless other provisions of the statute clearly show that the language was used in a sense different from its natural and ordinary meaning.").

. The majority appears to paint my views with a different brush. See supra T10 n. 16 (implying that I "suggest that ordinary meaning is the exclusive consideration" in matters of statutory interpretation). But that misreads the unanimous cases it cites, compare supra 143 n. 1 with supra 110 n. 16, and misunderstands my interpretive methodology.

. The majority does not so claim. It concedes that this is a case that comes down to a question of the ordinary meaning of "discharge."

. See Oliver Wendell Holmes, The Theory of Legal Interpretation, 12 Harv. L.Rev. 417, 417-19 (1899) (explaining that we consider not the "idiosynera-sies of the writer" but "the general usages of speech,"" or "what those words would mean in the mouth of a normal speaker of English"); Felix Frankfurter, Some Reflections on the Reading of Statutes, 47 Corum. LRev. 527, 536 (1949) ("And so we assume that Congress uses.common words in their popular meaning, as used in the common speech of men."); Frank H. Raster-brook, The Role of Original Intent in Statutory Construction, 11 Harv. J.L. & Pus. Por'y 59, 65 (1988) ("We should look at the statutory structure and hear the words as they would sound in the mind of a skilled, objectively reasonable user of words.").

. See also State v. Rasabout, 2013 UT App 71, 121, 299 P.3d 625 (citing the Merriam-Wessrer definition, as well as the MacmillanDiction-ary.com definition of discharge as to "fire a weapon").

. Some courts have offered this premise more explicitly. See, e.g., Muscarello v. United States, 524 U.S. 125, 128, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998) (interpreting "carries a firearm" in federal sentencing enhancement provision, 18 U.S.C. § 924(c), to encompass the conveyance of a firearm in a locked glove compartment of a vehicle; crediting what the court views as the "primary" definition of "carry," meaning the first-listed definition in various dictionaries). But the sense-ranking premise is a fallacy. See Stephen C, Mouritsen, The Dictionary Is Not a Fortress: Definitional Fallacies and the Corpus, Based Approach to Plain Meaning, 2010 BYU L.Rev. 1915, 1926-1938 (criticizing this analysis while developing extensive scholarly grounds for questioning the "sense-ranking fallacy"-the "notion that a given sense of a term may be considered somehow primary or ordinary or more likely to be legally operative than another sense simply because it is listed first in a dictionary"); see also J.M.W. v. T.I.Z. (In re Baby E.Z.), 2011 UT 38, ¶¶ 98-99, 266 P.3d 702 (Lee, J., concurring) (marshaling scholarly authority for the proposition that "dictionaries do not tell us how words are commonly or ordinarily used," particularly in the context-specific circumstances of a particular statute). 1

. See Waesster's THimp Int't Dicmonary 648 (3d ed.2002) (noting the "lack of comfort" meaning of disease is now obsolete).

. See, e.g., Moon v. Salt Lake County, 27 Utah 435, 76 P. 222, 226 (1904) ("By the phrase 'to Salt Lake City,' Congress evidently meant the inhabited portion of the city, where the station buildings were located, without reference to the artificial line which marked its territorial limits. That phrase was employed in the act in the same sense in which it is ordinarily used in common parlance with reference to the city. When Mr. A. says, 'I am going to Salt Lake City," he does not mean that he is simply going to the line that marks its territorial limits, but that he is going into the city where the people live."); Devasier v. James, 278 S.W.3d 625, 631 (Ky.2009) ("The next question is whether Cissell communicated 'an actual threat' at all. The word 'threat' is an ordinary English word in common usage and readily understood by English-speaking people. It requires no specialized legal definition, but in common usage the word "threat" carries two different meanings."); Extra Equipamentos E Exportacao Ltda. v. Case Corp., 541 F.3d 719, 727 (7th Cir.2008) ("An interpreter as normally understood is a person who translates living speech from one language to another. He is a type of translator, but the translator of a document is not referred to as an interpreter. Robert Fagles made famous translations into English of the Iliad, the Odyssey, and the Aeneid, but no one would refer to him as an English-language 'interpreter' of these works.") (citations omitted); Mallard v. U.S. Dist. Court for the S. Dist. of Iowa, 490 U.S. 296, 301, 109 S.Ct. 1814, 104 L.Ed.2d 318 (1989) ("[The statute's] operative term is 'request': 'The court may request an attorney to represent' an indigent litigant. The import of the term seems plain, To request that somebody do something is to express a desire thai he do it, even though he may not generally be disciplined or sanctioned if he declines. Of course, somebody who frequently refuses another person's requesis might not win that person's favor. A soldier who regularly fails to fulfill his superior's requests might not rise in the ranks as rapidly as would someone who was more compliant. But somebody who refuses a request, as the word is ordinarily used, may not be penalized formally for doing so, as a soldier who disobeyed orders might be court-martialed.").

. See, e.g., Cass Sunstein & Reid Hastie, Wiser: Getting Beyond Groupthink to Make Groups Smarter 190 (2014) ("People usually assimilate new information in a way that confirms their view of the world—confirmation bias-”); Barbara A. Spellman & Frederick Schauer, Legal Reasoning, in The Oxford Handbook of Thinking and Reasoning 720-21 (Keith J. Holyoak & Robert G, Morrison eds., 2012) ("[T]he research on confirmation bias.teaches us that both novice and expert decision makers are inclined to design their tasks in ways that yield results consistent with their initial beliefs. In light of what we know about motivated reasoning arid confirmation bias, therefore, it is plausible that judges often consult the formal law after having tentatively decided how the case, all or many things other than the law considered, ought to come out. The judges would then select or interpret the formal law to support outcomes reached on other grounds, as the Realists contend, rather'than using the formal law to produce those outcomes in the first place, as the traditional view of legal reasoning maintains”). Chief Justice Durrant' correctly notes a concern for this type of error (or perhaps for its cousin—motivated reasoning). See supra ¶ 37 n. 8. But such error is at least as likely to occur when a judge is assessing competing dictionary definitions or examples from memoiy as when considering examples of language from a corpus. And the point of the latter is to check the former. Adding one more set of data cannot do anything but minimize the risk of bias.

. See Susan Hunston, Corpora in Applied Linguistics 20 (2002) ("Although a native speaker has experience of very much more language than is contained in even the largest corpus, much of that experience remains hidden from introspection.”); Tony Mcenery & Andrew Wilson, Corpus Linguistics 12-14 (2d ed. 2003) (-"[Hjuman beings have only tire vaguest notion of the frequency of a construct or a word... Natural observation of data seems the only reliable source of evidence for such features as frequency.... There are certain types of language data which can only be gathered accurately from a corpus_[Frequen-cy information] is not susceptible to recovery via introspection.”); Bouglas Biber, Susan Conrad, & Randi Reppen, Corpus Linguistics: Investigating Language Structure and Use 26 (1998) ("Finding patterns of .use and analyzing contextual factors can present difficult methodological challenges. Because we are looking for typical patterns, analy-ses cannot rely on intuitions or anecdotal evidence. In many cases, humans tend to notice unusual .occurrences more than typical occurrences, and therefore conclusions based on intuition can be unreliable. Furthermore, we need to analyze a large amount of language collected from many speakers, to make sure that we are not basing conclusions on a few speakers’ idiosyncrasies.”).

. See Tony McEnery & Andrew Hardie, Corpus Linguistics: Method, Theory and Practice 1-6 (2012).

. See, e.g., FCC v. AT & T, 562 U.S. 397, 403-404, 131 S.Ct 1177, 179 L.Ed2d 132 (2011) (citing, in deciding that the "personal privacy" exemption in the Freedom of Information Act did not encompass corporate privacy, examples of "personal" as an adjective limited to individuals-as in "personal expenses," "personal life," and "personal opinion"); Smith v. United States, 508 U.S. 223, 242-43, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993) (Scalia, J., dissenting) (citing, in asserting that a sentence enhancement for "use" of a firearm in committing a crime should not extend to use as a bargaining chip, examples of "use" of an object for its intended purpose-as in the notion that the question whether someone "use[s] a cane" is not aimed at asking whether they beat their children with one).

. See, eg., Stongy I. Lanpay, Dictionaries: tHe Art ANp Crarr or Lexicoorapuy 190 (2d ed.2001). To the extent the majority and Chief Justice Dur-rant's concurrence rely on dictionaries, they are relying on the corpus analysis of others, as dictionaries are compiled through corpus analysis, and cite corpus examples to give readers an idea of usage. See "Illustrative Examples" in Guide to the Dictionary, in THe American Herttage DictioNARY XXV (5th ed. 2011) ("In this dictionary there are tens of thousands of illustrative examples that follow the definitions and show the entry word in typical contexts.... The examples are taken from our files of electronic and printed citations showing patterns of word usage by a broad group of educated speakers in a wide array of publications"). Thus, it may be that the shoot notion of discharge "applies specifically to firearms while the [empty notion] encompasses the more general concept of unloading cargo or emptying a container." Supra 136. But this conclusion is based on corpus linguistic analysis presented in the cited dictionary. THs American Hermace Dictionary cited by the Chief Justice does not limit the empty notion of discharge to a container or "ship." It just gives an example of a real-world use of language in which this sense of the word is used-in a sentence speaking of the discharge of a ship. That is corpus analysis.

. See State v. Canton, 2013 UT 44, ¶ 27 & n. 6, 308 P.3d 517 (interpreting the phrase "out of the state" in Utah Code § 76-1-304(1) based on an analysis of the use of that phrase in newspaper articles compiled through a Google News search); Carranza v. United States, 2011 UT 80, ¶ 24, 267 P.3d 912 (plurality opinion of Lee, J., joined by Durrant, J.) (interpreting "minor child" in Utah Code section 78-11-6 to include a fetus based, in part, on the fact that "the term 'child' is used extensively in the popular press to refer to the unborn"); id. 135 (dissenting opinion of Nehring, J.) (asserting the need for "caution against overreliance on dictionaries" and asserting that "since 1851, the term 'minor child' has appeared in the pages of the [New York] Times 2,866 times without ever referring to a fetus").

. See, e.g., Muscarello v. United States, 524 U.S. 125, 129, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998) (opinion of the court per Breyer, J.) (interpreting federal sentencing enhancement for one who "carries a firearm" in relation to a drug trafficking crime, 18 U.S.C. § 924(c)(1), in light of results of an online search of "computerized newspaper databases," which included "thousands of . sentences" using the phrase to "convey the meaning at issue here, the carrying of guns in a car").

. See, e.g., Moskal v. United States, 498 U.S. 103, 114-117, 111 S.Ct. 461, 112 L.Ed.2d 449 (interpreting phrase "falsely made" in 18 U.S.C. § 2314 by reference to the use of this phrase in common-law decisions); Morissette v. United States, 342 U.S. 246, 263, 72 S.Ct. 240, 96 L.Ed. 288 (1952) ("[WJhere Congress borrows terms of art in which are accumulated the legal tradition and meaning of centuries of practice, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it was taken and the meaning its use will convey to the judicial mind unless otherwise instructed.").

. See Ter Haxnpsoox or Corpus Lincuis-Tics 6 (Anne O'Keeffe and Michael McCarthy, eds., 2010) (touting the "potential of the entire world-wide web as a corpus, with its trillions of words, a veritable treasure trove of linguistic phenomena accessible at the click of a mouse").

. See Carranza, 2011 UT 80, ¶ 24, 267 P.3d 912 (interpreting "minor child" in Utah Code section 78-11-6 to include a fetus based, in part, on the fact that "the term 'child' is used extensively in the popular press to refer to the unborn"); id. 1135 (dissenting opinion of Nehring, J.) (asserting the need for "caution against overreliance on dictionaries" and asserting that "since 1851, the term 'minor child' has appeared in the pages of the [New York] Times 2,866 times without ever referring to a fetus").

. See Tus Routtencr Hanpsoox or Corpus Lincurs-tics, supra, 31-32 (explaining the importance of size in assembling a reliable corpus, noting that "for most questions that are pursued by corpus researchers, the question of size is resolved by two factors: representativeness (have I collected enough texts (words) to accurately represent the type of language under investigation?) and practicality (time constraints)").

. I found one article that vaguely supports Ras-about's view. See Colorado Man Ends Battle with Computer by Shooting it 8 Times, NBC News (April 21, 2015), http://www.nbenews.com/news/ *1279 us-news/colorado-man-ends-battle-computer-shooting-it-8-times-n345841. This article recounts the story of a "Colorado Springs man" who "was hit with a municipal violation after he ended a long-running battle with an uncooperative computer by blasting it eight times with a handgun." And it notes that the man "was given a violation for discharging a weapon inside city limits." This vaguely suggests a sense of discharge as encompassing the eight shots from a handgun. But only very vaguely. In context, it is not at all clear whether the referenced "viola tion" was one count or eight. And in any event .that question is a legal one-of the number of counts charged under the Colorado law, not the ordmary sense of a statutory phrase.

. The 27 articles supporting the single-shot notion of dlscharge of a firearm are listed below, in the same order generated by my Google news search:
1. http;//www.mecookgazette.com/story/ 2193311.html
2. http://www. news-gazette.com/news/local/ 2015-05-1 8/10-year-review-shots-fired-few- and-far-between.html
3. http://www.wpxi.com/news/news/local/2-charged-shooting-showered-6-year-old-glass/ nmCNS/
4. http://www.smh.com.aw/nsw/police-shoot-a-knifewielding-gosford-man-20150418-1 mnsnt.html
5. http//www.officer.com/article/12070687/ citizens-guide-to-armed-defense-book-review -
6. http://www.nbcmontana.com/news/missoula-police-investigate-shooting-death-of-dog"' 33216176
7. http://foxSsandiego.com/2015/04/15/bill-would-impose-stricter-penalties-for-making-school-threats/
8. http://www. newsweek.com/man—shot—fb1— boston-could-have-tiesisis-338334
9. http://www.dailycamera.com/boulder-county-news/ci_28248557/officials-elk-shot-illegally-rocky-mountain-national-park
10. http://www.coloradoan.com,/story/sports/ outdoors/2015/06/04/elk-shot-rocky-mountain- . national-park/28456193/
11. http;//www.adn.com/article/20150501/east-anchorage-swat-standoff-suspect-charged
12. http://elkodaily.com/news/police-arrest-felon-for-firearm-possession/article-8e8341b 6-65f9-5542-8ede-8f559de77ecf.html
13. http://www 20150530/news/1
14. http://www.wiky.com/news/police-investigate-officerinvolved-shooting-at-i265- and-brownsboro-rd/32355560
15. http://www.wacotrib.com/news/ environment/missing-killed-pets-prompt-concern-from-waco-residents-about-coyotes/ art1c1e_7fb2a4df017b—5e63—88b0 15af2496f7b Shtml
16. http://postonpolitics. blog palmbeachpost. com/2015/04/23/state-republican-lawmakers-approve-of-provision-to- outlaw-back yard-firing-ranges/
17 .http://www.spokesman.com,stories/2015/apr/ 26/no-shootings-at-hospitals/
18. http://www.azcentral.com/story/ claythompson/2015/04/20/birds-pests-pigeons-guns/26085253/
19. http//www.azcentral.com/story/ . claythompson/2015/04/16/pigeons-pests-control-birds-prevention/25905255/
20. http://www.mississauga.com/news-story/ 5575267-video-police-respond-to-criticism-over-spate-of-cop-shootings-in-peel/
21. http://tbo.com/news/florida/florida-could-soon-place-limits-on-drone-use-20150428/
22. http://www.therecord.com/news-story/ 5638717-sin-evidence-gathering-complete-in-guelph-general-hospital-shooting/
23. http://www.coastreporter.net/news/local-news/council-kills-goose-shooting-in-sechelt-1,.1812362
24. http://news:sty.tv/west-central/1320084-man-shot-and-mowed-down-bymitsubishi-4x
25. http://www.clknw.com/2015/04/09/71448/
26. http:;//www.magnoliareporter.com/news and_business/local_news/article_42d4f490-df3 e-11e4-8bd9-9342377a4a21 html
27. http://www .inquisitr.com/2022402/an-gibson-trampled-while-hunting-elephant-hunters-death-cheered-by-conservationists/

. See Adam Kilgarriff, Googleology Is Bad Science, 33 Computations Lincuistics 147 (2007) (touting the benefits of using the web "as a data source" for corpus analysis, but discussing the limitations of Google as a corpus search engine).

. See id. at 148 (noting that Google "hits are sorted according to a complex and unknown algorithm (with full listings of all results usually not permitted) so we do not know what biases are being introduced," such that "[ilf we wish to investigate the biases, the area we become expert in is googleology not linguistics").

. See id. {(noting that search engines like Google "will give you substantially different counts, even for repeats of the same query," while recounting an experiment in which "queries repeated the following day gave counts over 10% different 9 times in 30, and a factor of two different 6 times in 30," while explaining that "queries are sent to different computers, at different points in the updated cycle, and with different data in their caches").

. Costello, 666 F.3d at 1044.

. Id.

. See supra 177 n. 24.

. This is because the COCA is a lemmatized corpus, meaning that its words are coded for the type of speech they represent (noun, verb, adjective, etc.).

. The COCA interface allows you to save your searches-a feature that enhances transparency and replicability. My search is saved at http:// corpus.byu.edu/coca/?c=coca & q=34104740.

. The original list included eighty-six hits, but five were discarded as duplicates.

. See, eg., Barbara Bintliff, From Creativity to Computerese: Thinking Like a Lawyer in the Computer Age, 88 Law. Lisr. J. 338, 339 (1996) (warning that computer-aided legal research will undermine the ability to think like a lawyer); Molly Warner Lien, Technocentrism and the Soul of the Common Law Lawyer, 48 Am. U.L.Rev. 85, 85-86 (1998) (arguing that computer-aided legal research "may be harmful to the process of legal reasoning" and that lawyers should be aware of the "negative impacts" of using technology in this way); Robert C. Berring, Legal Research and the World of Thinkable Thoughts, 2 J.Arp. Prac. « Process 305, 316 (2000) (declaring that it "scares" the author "[ilf search engines like Google move into legal information"); Scott P. Stol-ley, Shortcomings of Technology: The Corruption of Legal Research, Am's Arp. Apvoc, Commirter Newst, 39 (April 2004) (the title says it all).

. There is a bit of a chicken-and-egg problem in the complaint about a lack of briefing. Until judges convey openness to analysis using a corpus like COCA, lawyers will not present it. My opinion is aimed at opening the door to better briefing.

. Certainly it's true that "'we would be ill-advised to reach a decision regarding unsettled law without the benefit of adversarial briefing.'" Supra 117 n. 30 (quoting St. Jeor v. Kerr Corp., 2015 UT 49, ¶ 14, 353 P.3d 137), But no one is reaching out to resolve an additional question of law in this case, or an unpreserved issue.

. If the concern is for a chance for the parties to challenge our analysis, my approach is less troubling. The main way that parties raise concerns with our opinions is through petitions for rehearing. A judge who presents a transparent corpus analysis opens the curtain in a manner allowing the parties to review and analyze his approach, and even challenge it on a petition for rehearing. No such response is available under the majority's approach. A take-my-word-for-it assertion of linguistic intuition is as unscientific and opaque as it gets. No party can challenge that kind of decision-on a petition for rehearing or otherwise.

. The majority claims that "[wle regularly refuse to conduct legal research, a field in which we are experts." Supra 118. By that I assume the court means only that we rely on adversary briefing on legal issues, and do not take it upon ourselves to construct legal arguments not presented by the parties. Fair enough. But that only underscores the need to stay focused on the legal issues presented by the parties. And here the question of the meaning of the unlawful discharge statute is undoubtedly and squarely raised.
On issues that are squarely presented, moreover, we regularly do take it upon ourselves to conduct independent legal research. No party would be surprised to read an opinion citing authority not presented in the briefs, or analysis taking a somewhat different angle than the parties. Our legal research is supposed to be sua sponte, and not at all limited to the legal material cited to us by the parties. Linguistic analysis is purely legal-aimed at understanding the terms of the law. So there is no bar on it being independent.

. To the extent courts and commentators have addressed this question, they appear to universally accept the propriety of judicial consideration of "legislative facts"-of outside investigation of matters of relevance to the resolution of an open legal question. See Bulova Watch Co. v. K. Hattori & Co., 508 F.Supp. 1322, 1328 (E.D.N.Y. 1981) (asserting that "whether we explore the economic, political, or social settings to which the law must be applied explicitly, or suppress our assumptions by failing to take note of them, *1285 we cannot apply the law in a way that has any hope of making sense unless we attempt to visualize the actual world with which it interacts," and that the "court's power to resort to less well known and accepted sources of data to fill in the gaps of its knowledge for legislative and general evidential hypothesis purposes must be accepted because it is essential to the judicial process"); see also Rosert E. Keeton, Junoinc 38-39 (1990) (discussing distinction between legislative and adjudicative facts).

. Max Rapm, Law as Loci anp Experience 138 (1940).

. I concede that the COCA database is less familiar, and may seem daunting. But my use of it-and the principal use for which it can be employed by lawyers and Judges—ls 'quite rudimentary. I am simply using it as an online ' database or search engine to find examples of language-as a parallel to a Google News or Lexis-Nexis search. COCA is no harder to use, and the output is no more difficult to read or understand. It's just better than other search tools for reasons explained above.
Admittedly a linguist would get more out of COCA than I can. But the mere fact that someone with greater training and expertise can use a tool in a way that lay people cannot does not deny the lay person of the ability to use it. Otherwise, cars would be used only by stunt drivers, knives would be used only by chefs, and smartphones would be used only by teenagers.

. The "fact that a jurist of Judge Posner's intellect and stature is capable of ... missteps" in corpus analysis, supra 137, is no reason to back away from this enterprise. Judge Posner's opin-fon is a helpful step in the right direction. We judges learn from each other incrementally over time. Past missteps in this field are no reason to stop trying to forge ahead.

. Antonin Scarta & Bryan GarnER, Reaping tas Law: THe Interpretation or Lecat Texts 400 (2012) (quoting Kent Greenawarz, Lecar Interpretation; Persprc. tives rrom OrtHEr DisciLiNEs AND Private TEXTS 168 (2010).

. See In re Adoption of Baby E.Z., 2011 UT 38, ¶ 88-105, 266 P.3d 702 (Lee, J., concurring in part and concurring in the judgment); State, in re J.M.S., 2011 UT 75, ¶ 40 & n. 3, 280 P.3d 410; Carranza v. United States, 2011 UT 80, ¶ 24, 267 P.3d 912 (opinion of Lee, J., joined by Durrant, J.); State v. Canton, 2013 UT 44, ¶ 27 & n. 6, 308 P.3d 517 (unanimous majority opinion).

. See John F. Manning, What Divides Textualists from Purposivists?, 106 -Couum. L.Rev. 70 (2006); Caleb Nelson, What is Textualism?, 91. Va. L.Rev. 347 (2005).

. Nelson, supra, 91 Va. L.Rev. at 348.

. Manning, supra, 106 COLUM. L.Rev. at 75.

, Nelson, supra, 91 Va. L.Rev. at 348.

. See, e.g., State v. Clark, 2011 UT 23, ¶ 17, 251 P.3d 829 (opinion of Lee, J., for a unanimous court) ("Any suppositions about what the legislature may have intended cannot properly override what it actually did."); Schroeder Invs., L.C. v. Edwards, 2013 UT 25, ¶ 25, 301 P.3d 994 (opinion of Lee, J., for a unanimous majority) ("Given the enactment of the [] statute, we are no longer tasked with advancing public policy as we see it. We instead must implement the particular balance of policies reflected in the terms of [the] statute. Those terms are the law. ..."); Graves v. North Eastern Services, Inc., 2015 UT 28, ¶ 67, 345 P.3d 619 (Lee, J., opinion of the court) ("The governing law is defined not by our abstract sense of legislative purpose, but by the statutory text that survived the constitutional process of bicameralism and presentment. We may resolve ambiguities in the text of the law by reference to reliable indications of legislative understanding or intent (as in legislative history). But the invocation of extra-statutory intent as a matter overriding the statutory text gets things backwards. The statutory language is primary; legislative history is of secondary significance.").

. See Manning, supra, 106 Corum. L.Rev. at 78 (explaining that "textualists recognize that meaning can never be found exclusively within the enacted text," and "that evidence of purpose ... may also form an appropriate ingredient of the context used to define the text").

. See id. at 87 (explaining that modern purpo-sivism concedes that "the semantic meaning of the text casts ... the most important light [] on the purposes to be attributed to the legislature").

. That is not to say that there are no differences between the two approaches. The different starting premises lead to some nuanced differences in emphasis. Textualists tend to "give precedence to semantic context-evidence that goes to the way a reasonable person would use language under the circumstances." Manning, supra, 106 Corum L.Rev. at 76. And purposivists tend to "give priority to policy context-evidence that suggests the way a reasonable person would address the mischief being remedied" by the legislation in question. Id. "[PJractitioners of each methodology will consider both forms of contextual evidence in cases of ambiguity. But textual-ists give determinative weight to clear semantic cues even when the conflict with evidence from the policy context. Purposivists allow sufficient ly pressing policy cues to overcome such semantic evidence." Id.; see also Nelson, supra, 91 Va. L.Rev. at 349 (explaining that purposivists tend to be more accepting of "open-ended" sources for finding intent, while textualists are more focused on "relatively rule-ike" grounds for interpretation}.

. Manning, supra, 106 Corum. L.Rev. at 71. This is "spirit of the law" purposivism-the notion that courts should seek to vindicate the law's spirit even when it is incompatible with its text. It is classically represented by the U.S. Supreme Court's decision in Church of the Holy Trinity v. United States, 143 U.S. 457, 12 S.Ct. 511, 36 L.Ed. 226 (1892). The statute in that case prohibited "the importation and migration of foreigners and aliens under contract or agreement to perform labor or service of any kind in the United States, its territories, and the District of Columbia." Id. at 463, 12 S.Ct. 511. And despite the fact that the statute exempted "professional actors, artists, lecturers, singers and domestic servants" but not pastors or ministers, the court concluded that a contract to pay for the migration of a church pastor was not covered. Id. at 459-60, 12 S.Ct. 511. It based its conclusion, moreover, not on the terms of the statute but on its confident sense of legislative purpose-that Congress was concerned only about the importation of "an ignorant and servile class of foreign laborers," and not "brain toilers" like church pastors. Id. at 463-64, 12 S.Ct. 511. In further support of that decision, moreover, the court cited extra-textual evidence of purpose (in legislative history and its sense of our history as a "Christian nation"). Id. at 471, 12 S.Ct. 511.

. See supra %43 n.1 & 1121.

. See Canton, 2013 UT 44, 127 n. 6, 308 P.3d 517.

. See, e.g., Tony Mcrnery & Anprew Harps Corpus Metgon, THEory amp Practice 251 (2012) ("A quantitative result is considered statistically significant if there is a low probability (typically less than five percent) that the figures extracted from the data are simply the result of random chance. ..."). To the extent the majority is arguing that the thirty-six hits excluded for ambiguity could have carried the same sense as the only one hit did-making many more types of that kind of sense-it is drawing the wrong baseline. The analogy would be to thirty-six of eighty-one people fielding calls from a polister indicating that they were undecided. The thirty-six simply aren't part of the baseline for determining statistically significant differences between two candidates.
The majority's invocation of statistical significance highlights broader conceptual problems not with corpus analysis, but with the definition of ordinary meaning itself. Unlike so many other legal terms (ie., negligence or preponderance of the evidence), ordinary meaning has escaped definition, perhaps because judges have viewed the concept as self-defining. See also Buack's Law Dictionary 1128 (10th ed.2014) (cross-referencing "ordinary meaning" to "plain meaning," and defining the latter as "[the meaning attributed to a document (usu. by a court) by giving the words their ordinary sense, without referring to extrinsic indications of the author's intent). The majority seems to embrace a sense of ordinary meaning encompassing a principle of statistical significance-that a sense of a word is more *1290 ordinary if it is statistically significantly more common than another. But other definitions seem possible-including that sense of a word is more ordinary if it is merely more frequent than another (occurring more than fifty percent of the time). I do not seek to define the correct sense of ordinary meaning. But I do suggest that by any reasonable definition, the corpus findings here show that the ordinary meaning of discharge (of a firearm) is that of a single shot.